I'll rise. I'm going to go ahead to other courts. This division is now in session. The Honorable Justice Marietta Obey Clark is presiding. Please sit down. Madam Clerk, would you call the first case, please? 1-21-1557 People v. Juan Donald Good afternoon. Before we start the time running, would the lawyers who are going to argue please tell both of us, each of you tell all of us your names. And the lawyer for the appellant, please let us know if you'd like to reserve any time for rebuttal. Good afternoon, Your Honor. Hannah Peterseff, I'm the state appellant defender on behalf of Juan Donald, the appellant. I would like to reserve five minutes for rebuttal. Thank you. Thank you. Whenever you're ready, you may proceed. I'll remind both of you to keep your voices up. This microphone reports, but it doesn't amplify, and there are people all the way in the back who want to hear you. Thank you, Your Honor. May it please the Court. Good afternoon, Your Honors. My name is Hannah Peterseff, and I represent to Juan Donald, the appellant in this matter. In this case, we raised two issues in the briefs. However, I'd like to focus my time today on Issue 2 concerning the double enhancement issue. As Your Honors are likely aware, this is a developing area of law, and there is a new Rule 23 order that was issued out of a separate division last week. I am, of course, happy to answer your questions regarding Issue 1 as we move forward. In this case, the trial court applied the presumptive extended-term sentencing guidelines set forth in Section 4.5.110 of the Code of Corrections. Application of these extended sentencing guidelines was improper in this case because the court used the same prior conviction to establish an element of Tawan's offense of unlawful possession of a weapon by a felon as to apply the presumptive extended sentencing guidelines. There's no question that in this case, that was a double enhancement. Do you disagree with the law that if the legislature specifically says, this is how we want you to do the sentence, then whether it's a double enhancement or not, it doesn't matter, it's still permissible? I don't disagree with that law, Your Honor, and I think that's really the crux of the issue before the Court today. As Your Honors are likely aware, the Hayward case that came out last week addressed this sentencing enhancement provision and concluded that the legislature did intend for a double enhancement to be included in the sentencing guidelines there. Now, certainly a double enhancement can be intended by the legislature. However, there must be a clear legislative intent for this Court to find that that is the case. And in fact, the slightest ambiguity in any statute calling for a double enhancement requires application of a rule of lenity in favor of the defendant. And I want to be clear that courts have rarely found that this type of clear legislative intent is present, especially when it comes to extended and enhanced sentencing. So, contrary to the Hayward Court's conclusions, there is no clear legislative intent in Section 110 to permit double enhancements. And, Beck, you're up for a second. You just said that the courts have rarely found that these statutes don't have some ambiguity in terms of sentencing. Did I understand that correctly? Yes, Your Honor, that's what I... What do you base that on? So, the various cases that myself and my colleagues cited in our briefing, out of those cases, there's only a handful that have found a clear legislative intent to impose a double enhancement. An example of such case would be the Phelps case. The Illinois Supreme Court in 2004 held that it is a permissible double enhancement to use severe bodily injury to both impose consecutive sentencing and as a basis of the offense. Now, this Court actually did find that it wasn't exactly a double enhancement, but went on to conclude that even if it was, it was intended by the legislature. But the statutory language in that case was very different. There, the imposition of consecutive sentencing was when one of the offenses for which the defendant was convicted was a certain type of felony and the defendant inflicted severe bodily injury. So there, it was very clear in the statutory language that the legislature was talking about the same offense of conviction. Here, in this case, Section 110 provides that when a person is convicted of unlawful use or possession of a weapon by a felon, when the weapon is a firearm, and the person, after being previously convicted of a qualifying predicate offense, then the person shall be subject to the sentencing guidelines at issue here. Now, first, there's nothing in that statutory language that makes explicit that it can be the same offense as used to establish the UUWF conviction. But what's the ambiguity that you're referring to? You're saying that it's – if there's any ambiguity, then we should decide this in favor of the defendant. Certainly. So what is the ambiguity? Certainly. So I would point this Court to prior decisions addressing the same exact statutory language. So under Section 553.2b of the Code of Corrections, that's the General Extended Term Sentencing Statute, is the same statutory language. After being previously convicted of a qualifying offense, the Court may apply discretionary extended sentencing. In that statutory context, courts have previously held, and that's the Rankin and Bahena cases, that a double enhancement was not clearly made explicit in the statutory language. And that's the same language that we have here. And so it's the same ambiguity that's present. And, again, it's – we're talking about any slight ambiguity in the statute. And I think, you know, there's certainly ways in which the legislature could have made it more clear if they did, in fact, intend a double enhancement. The example I can give is, in the statute as it's written, it states, when a person is convicted of unlawful use of a weapon by a felon, when the weapon is a firearm. Now, that clause, when the weapon is a firearm, clearly refers to the offense of conviction. I think if the legislature had included the qualifying predicate in that clause, so, for example, when a person is convicted of unlawful use of a weapon by a felon, when the weapon is a firearm, and the qualifying predicate is, you know, one of these qualifying felonies, that would certainly make it more clear. And I'm sure there's other ways that the legislature could have made it more explicit as well. Am I to understand that your argument is that it becomes ambiguous when the legislature references another statute? In other words, you have to go to look at the other statute, in this case, Section 5-4.5-110, to see what that statute says. Is that what you're saying is ambiguous here? No, Your Honor. I think just simply the language of 110 itself is ambiguous with regard to the language after being previously convicted of a qualifying predicate offense. That language does not explicitly state that the qualifying predicate offense can also be an element of the offense of conviction. And as I said before, that same language has already been construed by the courts not to permit a double enhancement. And we know that the legislature is presumed to know of the court's prior case law and prior construction of statutory language. So when they were enacting Section 110, if they intended a different result, if they intended double enhancements to be permitted, we would think that they would at the very least use different statutory language than what's previously been construed, not to permit a double enhancement. So moving on to sort of the Hayward Court's analysis of this issue, it's our contention that Hayward was wrongly decided because it did not address that aspect of the statutory language. In fact, when addressing the Rankin and Bahena cases, the Court simply concluded that they were not applicable because they addressed a different statute. But the Court did not address the fact that that statutory language is the same. The Court also did not address the fact that Section 110 includes a very wide range of qualifying predicate felonies. And that wide range of felonies also suggests that the legislature did not have in mind double enhancements when enacting the statute. Now, the Hayward Court, even though the Court concluded that the statute was clear, it then went on to address legislative history. And that in itself was a bit of a wrong turn because, as I've explained before, if there's no ambiguity, there's no need to do that. Correct. And if the statute is ambiguous, then instead we should be applying the rule of lenity. But that's sort of harmless error, if you will. I mean, if the rest of the analysis holds up, we can ignore the part that addressed legislative history. Certainly. But so certainly if this Court found that the legislative language is clear, then you would be agreeing with the Hayward Court's decision. But so just so I'm clear on what you're focused on in the language that makes you say the legislature did not intend, what the State is saying and what the trial court said is, if the predicate offense is one of these listed offenses, this is where you get sentence. And I don't know if you call that double enhancement or not. The State argues it's not even double enhancement. It's just this is where you look if this is your predicate. And what is this in this language that you are relying on to say is that is not correct? So, again, I believe it comes down to that phrase, after being previously convicted of a qualifying predicate offense. So that there has to be a whole other offense, not one of these listed offenses? That is the predicate offense. So it would have to be one of the listed offenses. Okay. But that same listed offense could not also be the basis of the unlawful use of a weapon as a felon. So there has to be two of them, basically. Correct. And that's exactly how the general extended term sentencing statute has been interpreted in the past. And, you know, because that, you know, maybe even that's up for debate. But if it's up for debate, it's ambiguous and we apply the rule of lenity. So as I was saying, the Hayward Court incorrectly turned to legislative history rather than applying the rule of lenity. And then even when addressing the legislative history, that analysis was flawed as well. The Hayward Court's analysis of legislative history addressed some of the debates that took place during the passage of the Safe Neighborhoods Reform Act of 2017. Now, this was a very contentious bill that was debated over a number of days. And so I think it's also fair to say, and courts have recognized, that we really shouldn't drop too much or try to speculate too much from comments that are made during those debates. But regardless, it is true that there was some discussion of penalizing second-time gun offenders as well as repeat gun offenders. That was certainly part of the debates in this bill. However, there were also legislators in the same debates referenced in the Hayward decision that were concerned about the bill applying too broadly. And in response to those comments, the sponsor of the bill stated that it actually would not apply to very many individuals at all and would have a minimal impact on the Department of Corrections. So those comments actually suggest that the legislature did not intend for this section to have such a broad impact. Whereas if we did allow double enhancements to occur under the statute, it would have... So you believe it's going to happen to everyone? It would certainly happen to a very wide range of defendants, especially given the wide range of qualifying predicate felonies. Which I might note, many of which don't even, I shouldn't say many, several of which don't even include the use of guns as a predicate. So, again, I think it's unclear at best what the legislature intended just from drawing from these comments. And so, again, because the statutory language itself has at least some slight ambiguity to it and the legislative history doesn't necessarily clear up that ambiguity, the rule of lenity should have been applied in both Hayward and in this case to conclude that the presumptive extended sentencing guidelines should not have been applied in this case based on the same prior conviction. You have a few minutes left, and if you don't have any further argument in this, I think we would like you to briefly address the sufficiency of the evidence. Certainly, I'd be happy to do so. So in this case, the state failed to prove constructive possession beyond a reasonable doubt because there was insufficient evidence that Tawan either knew of the existence of the gun in the drawer where he was asleep or exercised immediate and exclusive control over either the gun itself or the bedroom. Now, with regard to knowledge, certainly there's no direct evidence of knowledge. The gun was concealed in a drawer. There's no evidence of anything else that would tend to lead to an inference of knowledge. And in fact, the fact that the gun was concealed undercuts such an inference. With regard to control, finding that Tawan controlled the bedroom would allow for an inference of knowledge, but courts have made clear that that inference only arises if the person has regular ongoing control. Mere access to the area is not enough. So in essence, this Court has to conclude that this was Tawan's bedroom or a bedroom that he was using regularly. How does the joint possession play into that? Sure. So constructive possession can be joint. And certainly there was another person in the room at the time, and there were other people in the house. The fact that joint possession existed wouldn't necessarily undercut an inference of constructive possession, but it's important that constructive possession on Tawan's behalf has to be shown first. So he can have joint possession with someone else, but only if he personally has both knowledge and control over the contraband. And with regard to those elements, particularly the control element, the evidence in this case was extremely sparse and relied on impermissible speculative inferences. So what we have here are there were two documents with Tawan's name on them in the room, one in the closet, so not, you know, not close to the contraband, and one on top of the dresser. These documents were dated from months prior, and they weren't the type of personal important documents that we would expect someone to keep in a safe place or keep close to their person, like a birth certificate, an ID, a Social Security card. These were simply documents addressed to Tawan from his time, previous time in a prison. Right. They weren't addressed to the property address. They were addressed to the prison address. That's correct. That's correct. And courts have concluded that where male or other documents have a different address on them, that that undercuts an inference of control of the premises as well. There was also adult male clothing in the room, but once the agent... There was also female clothing in the room as well. The agent was not able to say that there wasn't female clothing. Well, they did acknowledge that in their brief, that there was female clothing. Right. Yes. No, there was female clothing in the room. We don't know really what kind of clothing was in the drawer, specifically where the gun was found. And even the adult male clothing, we don't know what size it was. We don't know what size Tawan was. Really, the agent was simply speculating that it might have been his clothing in the room. We also don't know how many items there were. You know, was this a very sparsely furnished room? Was it chock full of clothes? We don't know. And then the third piece of evidence is an electronic device that the agent saw in the room that she believed was Tawan's electronic monitoring device. But upon further questioning, she admitted that she had no specific training in how to identify these devices or trace them back to a particular person. She only believed that the device was his because he wasn't out of range, but he would have been within range no matter where the box was in the house. And there was even testimony which the trial court credited that the electronic monitoring boxes look very similar to a cable box, and there was a television in the room as well. So, you know, all of this together is, like I said, very sparse evidence that Tawan had any sort of regular ongoing control of the room, such that we could infer both his control of the contraband and his knowledge of its existence in the room. Now your time is up unless there are any other questions. All right. Reserve the rest for rebuttal. Good afternoon again, Your Honors. Once again, this is Assistant State's Attorney James Stumpf for the people of the State of Illinois. And as my opposing counsel Hill did, I'll start off the double-enhancing argument as well. So the legislature here clearly intended for a defendant such as this one, who was previously convicted of AUUW, to have that same offense, not only be the predicate for UUWF, but also make him eligible for the 7-14 year sentencing range. And this is from the plain language of Sections 24-1.1 and 5-4.5-110. They make it very clear. Subsection E of 24-1.1, a few lines down, states, if an offender has been convicted of A, A as in singular, felony violation of Article 24 of this code, the offense is elevated to a Class 2, for which the person shall be sentenced to not less than three years and not more than 14 years, comma, except as otherwise provided for in Section 5-4.5-110. Now, in that section, subsection B and C, make it quite clear that when the person is convicted of UUWF and that person has previously been convicted of A, singular again, a qualifying predicate offense, the sentence is between 7 and 14 years, unless the court deems that a departure is warranted. Now, it's our position that – and another indication from the statute is the title of Section 5-4.5-110. It is sentencing guidelines for individuals with prior felony firearm-related or other specified convictions. Again, prior could be just one. Now, so it is our opinion that the language is explicit, contrary to what the opposing counsel is saying, that this type of defendant with a prior AUUW conviction could have that same conviction used not only as a predicate for UUWF, but also to make him eligible for the presumptive 7-14 year range. Now, it is our position that Hayward was very influenced by this. Yeah, Hayward. And again, it's our opinion that it was very well reasoned. In fact, isn't Hayward self-defeating, though, because if the rule of lenity applies when there's ambiguity, and as my colleague pointed out, you only look to legislative history if there's ambiguity, the court in Hayward looked to legislative history presumably because it was ambiguous? Well, I disagree that it was ambiguous, Your Honor. So you're saying that the Hayward court erred by looking to legislative history. It didn't need to? Not necessarily. I read Hayward more so as, and here is further evidence of what the legislature intended. They thought, I mean, Hayward thought the language was clear, and I think the legislative history was clear. Then why not just end it there? Sorry? Why not just end it there? If the language is so clear under the text of the statute, that's the beginning and the end of it. By looking to legislative history, isn't the court in Hayward acknowledging that there's some ambiguity and that's why we have to look to legislative history? I don't think so, Your Honor. No. I thought, I think Hayward found the language to be clear, so no, I don't think they found any ambiguity in the statute. But, I mean, the language of the House debates from, you know, May 29, 2017 make it quite clear too. I mean, just to support what I just said, page 92, at the bottom of the page, Representative Durkin says, he's referring to the 7-14 year sentencing range, and he says that this is a new sentencing structure for second-time gun offenders. Second-time gun offenders, just like this defendant here. This defendant is exactly the type of person the statute was enacted to make eligible for the 7-14 year range. I'd also like to point out that, you know, further commentary from that debate was this was designed to combat gun violence predominantly in the city of Chicago, and as the proponents of the bill, including Representative Durkin in the Senate and Senator Raul in the Senate, this was to combat, they considered these people, repeat gun offenders, as the ones more likely to commit violent offenses, and they thought that the 7-14 year sentencing range was enacted to combat gun violence. And so that's my response to that. I'd also like to point out the language from the Wheatley case, paragraph 27 particularly. We cited in our brief that we don't, it's our position that this statute isn't even an enhancement. It sets a 7-14 year sentencing range, and then it allows the court to go down from there. If it deems certain, under subsection D, certain factors are, qualifying factors are met. So it's the opposite of enhancement. The statute is a decrease. Did any court say that? No, it did not, Your Honor. No. That is all I wanted to say about the double enhancement argument. Do I have any more questions? Any questions?  Do you want to address sufficiency? Yes, please. Yes, Your Honor. Now, here, the standard review, of course, is that any rational trier of fact could have found the defendant's, the defendant's constructive possession of the firearm beyond a reasonable doubt. Now, let's look at the two elements, control and knowledge. Control was easily established here through Agent Samuelson's testimony that on October 9, 2019, at 7 o'clock in the morning, she arrived at the defendant's house to perform a parole compliance check. She discovers the defendant in a basement bedroom with a girl, another girl, a woman, his girlfriend, on the bed. Now, the defendant is positioned on the bed in the position closest to the dresser. He is just a few feet from this dresser, and right on top of the dresser is personal property inventory documents that contain his name and his IDOC number on it. Now, what is just below, inches from this document, in the top left-hand drawer, right on top of smaller clothing, is a firearm and extended magazine. So that goes to control. So what is the significance of him being on the side of the bed closest to the dresser? Because people tend to have their preferences on what side of the bed they should be. I understand where you're coming from, Your Honor. Right. Yeah. Of course. I mean, that's one piece of the analysis. You make it sound like the gun was in plain view, but it wasn't. It was in the drawer. Of course not, Your Honor. So what counsel is really arguing is that the problem is knowledge. Sure. So help us with the knowledge issue. Sure. I think knowledge can be inferred from control. There's a lot of cases that come from that. The amount of control that, with respect to, those would be evidence to control. And I haven't finished my control analysis, so if I may kind of answer that. Please, finish. On top of what I said about the dresser and the documents on there and the defendant sleeping in bed at the time of day, you also have what is in the closet. You have a document addressed to him, another document, inside of an envelope, but also in both of those documents have his name and they have his IDOC number on them. Then you have predominantly male clothing is the testimony. We have predominantly male clothing. It was in the testimony that that was his sister's room, though, too. There was. There was, Your Honor. And, you know, that was what his mother said, and the trial judge, Judge Wilson, didn't find her credible. He didn't believe her. And Judge Wilson even knows, at best, at best, that room was his daughter's room. But the defendant was found sleeping there at the time at 7 a.m. I haven't mentioned, there's electronic monitoring boxes in there and clothing and documents. So you can think of all the reasons why he may be sleeping downstairs in the lower room with his girlfriend. Sure, sure. But, at best, at best, it is his daughter's room, but it's a situation of joint possession. He also has control over that room. It wasn't his daughter's room. I misspoke, Your Honor. His sister's room. I apologize. So, yeah, it is our opinion knowledge is inferred from the amount of evidence establishing his control over the bedroom. Do Your Honor have any other questions on this? Yeah, I struggle with the knowledge issue, and I guess you may want to help me with that. Well, I apologize, Your Honor. I think that the evidence that most clearly goes to knowledge would be the fact that he was there at 7 a.m. sleeping in his bed. With his girlfriend. Exactly. That's part of the house. There were, what, eight other people in the house living in the home? Sure. And they were found in the lower-level bedroom together. Sure. There's a testimony that that was his sister's bedroom, and the gun was not visible at the time. It's possible that he didn't know there was a gun in the room. It wasn't his room. Sure. Well, taking all that as true, Your Honor, he still has his personal property inventory document, which has his name, his IDOC number. It's not an insignificant. Which he may have just pulled out of his past pocket. I don't think so, Your Honor. That's not an insignificant document. I mean, that's his personal property from when he was incarcerated. But they were all documents. He probably didn't even need those documents, other than maybe not having his inmate identification number. Most inmates know that by heart anyway. You may not realize that, but they do. It was inches from where this gun was, Your Honor. And the gun wasn't hidden. It was in the drawer. It wasn't hidden in the drawer. Justice Taylor just addressed that. Yes, Your Honor. People do have preferences. Everybody in this room can tell you what side of the bed they like to sleep on. So that doesn't get us anywhere. We're talking about the knowledge. We're trying to show knowledge. We're trying to show that he knew that there was a gun in a drawer, which was not visible. He was just in there with his girlfriend, which that would be the likely place they'd be. There were eight other people in the home, and all the other people were upstairs. Your Honor, taking the totality of the circumstances here, the standard of review on appeal here is any rational trial fact could have found the essential control and knowledge beyond a reasonable doubt. That is the standard here. And it is our opinion that based on the totality of evidence that was presented at trial, that was sufficient to sustain his conviction. Do you guys have any other questions? Any other questions? Well, we please ask that you affirm the defendant's conviction and sentence.  Thank you, counsel. Just briefly, Your Honors. First, with regard to the constructive possession issue, my colleague made reference to the fact that the documents found in the room had his IDOC number on them, and I believe he called them significant documents. I would dispute that. What we're talking about here was a property inventory form basically listing the documents that Juan had returned to him when he left the Department of Corrections facility. Listing the property that he had returned to him. Exactly. So it listed, I believe, some postcards and papers. That's what was returned to him according to this form. And Your Honors can view that exhibit. It is in the record as State's Exhibit, I believe, 1. And so this is not the type of significant document that one would expect to be, you know, close to your person or kept in a safe place, kept in your bedroom, for example. This is simply a form that he received several months prior when he left the prison facility. With regard to the double enhancement issue, I did want to address the State's contention based on Wheatley that... Let me, before you move on. Sure. What do you say to counsel's argument that, you know, under the totality of the circumstances, this was a call for the trial judge to make? And a reasonable person could have come to the conclusion that the trial judge came to. Your Honor, certainly... And a reasonable person could have come to the opposite conclusion that we would be affirming for the same reason. Certainly there's a high bar for this type of challenge, Your Honor. And I acknowledge that in most cases this is for the trier of facts. And in this case, that's all we have here. We have very limited evidence that Tawan had any sort of regular ongoing control of this bedroom such that we can infer both his control of the gun and his knowledge that it was in the drawer. You know, if he was simply spending the night there, as Justice Walker was discussing, or maybe he spent a few nights there once, you know, every couple months or so, we don't really know how often he was in this room. He had to have regular ongoing control of the room for this court to infer that he knew of the gun's presence and controlled it. Just to correct myself, we wouldn't be here if it was a finding of not guilty. Certainly. But you got to make a point. So, if I may return to the double enhancement issue. So, contrary to the Wheatley Court's conclusion, the imposition of extended term sentencing under the Section 110 is a double enhancement. The Wheatley Court was addressing whether the trial court's decision to depart from the presumptive extended guidelines based on a prior conviction could be a double enhancement. And that was not considered to be a double enhancement because it was an exercise of discretion. But the application of an extended sentence to begin with is considered an enhancement. And prior case law has established that well. The Rankin and Bahena cases with regard to the general extended sentencing statute, for example. Essentially, any time a sentence is extended, increased beyond the regular sentencing range, that is an enhancement. And if the same prior conviction is used to impose that enhancement as it is an element of the offense, that is a double enhancement. So, the Wheatley Court was simply addressing a different part of the statute. And the Hayward Court actually implicitly assumed that there was a double enhancement with regard to increasing the sentence beyond the regular range. But they went on to say that this is what the legislature intended. Correct, yes. And I believe I addressed that analysis in my prior comments. I did also want to point out that Section 110, there's a number of situations where Section 110 applies even without double enhancements. So, to the extent the legislature was intending to increase the penalties available for repeat gun offenders to address the problem of gun crime in Chicago, that purpose is accomplished by the statute even without allowing for double enhancements. So, again, unless the legislature made it extremely clear, which they did not, that a double enhancement I'm sorry, and what are you referring to where 110 wouldn't be a double enhancement in your view? Certainly. So, under Section 553.2b, the general extended sentencing statute, discretionary extended sentencing is only available if a defendant has a prior conviction for the same or similar class felony. So, under 110, the legislature eliminated that requirement, essentially. So, there are a number of situations where a person might have a lower class gun crime in their background, and Section 110 would then apply to push them into that presumptive sentencing guidelines. This is now applying to all felonies. Exactly. So, for example, someone convicted of a Class II UUWF or AUUW with a prior Class III gun crime in their background is now eligible and, in fact, required to go into the presumptive extended sentencing range, even though they would not have previously been eligible for extended sentencing under the general statute. Okay. So, counsel's reference to that section in the UUWF statute that says, except as where provided in Section 110, that doesn't necessarily lead to the conclusion that a double enhancement is intended. It simply is referring to situations where Section 110 does apply, which does not require a double enhancement. If this Court has no further questions? Well, you kind of abandoned your first argument, but I'd like you to talk some more about the knowledge issue. Oh, I'm sorry, Your Honor. I'm happy to do so. As I was saying before, in order to infer knowledge, it is necessary to establish regular and ongoing control. The evidence in this case was extremely sparse and required impermissible speculative inferences to reach that conclusion. As Your Honor was discussing earlier, the gun was not visible to anyone entering the room, anyone previously in the room, so there's no indication that Tawan would have known of its presence unless we can infer that he had that kind of regular ongoing control. Of course, there was no DNA evidence, fingerprints, inculpatory statements, anything. I don't recall any evidence regarding ownership of the gun. Did I miss that? I'm sorry, could you repeat your question? Which gun was it? We don't know, Your Honor. Yeah, I don't recall. Yeah, there was no evidence of that in the record, Your Honor. Again, no testing for fingerprints, no testing for GSR, DNA, anything that would actually link Tawan to this gun. All we have is the fact that it was in the room, concealed in a drawer, and he... I don't know if that testimony probably didn't come out, and maybe it's just not true, so we have no idea who the gun is even registered to. Correct. That's correct, Your Honor. So once again, there's no connection to Tawan other than by speculating that he must have had some sort of ongoing control of the room. And again, as I have argued, the evidence on that point is extremely sparse and requires this Court to entertain speculative inferences that we cannot... So, I mean, it's really a question of at what point does it become speculation because the courts have said that you can rely on circumstantial evidence and the knowledge element is often inferred from circumstantial evidence. Certainly. And you're right. I agree that there's a pretty thin line between inferences and speculation. But in this case, I think it falls on the line of speculation. Certainly in a lot of the prior cases, the same type of evidence has been found not to be sufficient to establish constructive possession. So, you know, there's cases talking about where clothing is found in a room, maybe adult male clothing, maybe even male clothing of a particular size, such as in the Terrell case. But... Well, you just decided people would be Davis. Did you do it? I believe so. It seems like it's on point when this issue is brought up. I would agree, Your Honor. You know, again, there's cases where if clothing is found, that's not necessarily enough without some sort of connection to the defendant. You also cited Carraway. Carraway, I believe, is extremely on point. I think that was well put, Carraway. Well, perfect. I believe Carraway is extremely on point. You know, that was a case where there was some personal effects, but they weren't found, you know, addressed to the defendant at the particular residence. And, you know, like I said, there's a lot of facts in many of the prior cases with the clothing, the personal effects that weren't addressed to the defendant at the residence, the lack of any other sort of real tie to the ongoing control of the room. So if this Court has no further questions, I submit the case for decision. Thank you both. Thank you. Excellent job. You both did a powerful argument in breaking this, and we will take this matter under advisement. We will stand in brief recess and then re-adjourn to the next case.